## INMAN v. BROWN.

(Court of Civil Appeals of Texas. San Antonio. April 24, 1912. Rehearing Denied May 29, 1912.)

1. BROKERS (§ 86*)—ACTIONS—SUFFICIENCY OF EVIDENCE—CAUSE OF EXCHANGE.

Evidence in an action for a commission due to plaintiff's assignor for procuring an exchange of property *held* to show that the exchange was effected by assignor's efforts, and that both property owners utilized his efforts in the negotiations.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 116–120; Dec. Dig. § 86.*]

2. BROKERS (§ 67*)—COMMISSIONS—EFFECT OF CUSTOM.

To make a custom to the effect that each owner should pay one-half of the commission due a broker for effecting an exchange of property, applicable as a binding custom, the broker must have acted as a middleman in the mutual interest of both parties without being the particular agent of either, since otherwise the custom would be permitted to modify a rule of law.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 52–54; Dec. Dig. § 67.*]

3. BROKERS (§ 88*)—ACTIONS—SUFFICIENCY OF EVIDENCE.

In an action for commissions due plaintiff's assignor for procuring an exchange of property, evidence *held* to make it a jury question whether the assignor was acting as the agent of one of the owners.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 121, 123–130; Dec. Dig. § 88.*]

4. SET-OFF AND COUNTERCLAIM (§ 35*)—PROPRIETY OF COUNTERCLAIM.

In an action for commissions claimed to be due plaintiff's assignor for procuring an exchange of land owned by defendant for a hardware stock owned by a hardware company, defendant could plead against plaintiff's demand a counterclaim for damages on the ground that the plaintiff, who was president of the hardware company, personally pointed out to defendant certain goods as belonging to the hardware stock traded, when they, in fact, belonged to another who afterwards removed them; the counterclaim being an unliquidated demand.

[Ed. Note.—For other cases, see Set-Off and Counterclaim, Cent. Dig. §§ 58–64; Dec. Dig. § 35.*]

5. CORPORATIONS (§ 398*)—ACTS OF OFFICERS—BILL OF SALE.

The word "president" signed after the name of one of the several stockholders of a corporation who executed a bill of sale in their own names, except for the addition of the word "president," was merely descriptio personæ, and did not make the instrument that of the corporation, but left it a joint and several obligation of the signers.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1592–1594; Dec. Dig. § 398.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

**6. CONTRACTS (§ 188*)—PARTIES — LIABILITIES OF THIRD PERSONS.**

That a real estate broker had an agreement with a company that they should divide the compensation of all business closed in the company's office would not give the company any claim for compensation against one of the owners for whom the agent exchanged property, though the deal was closed by the agent in the company's office; there being no contractual relations between such owner and the company.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 808–810; Dec. Dig. § 188.*]

**7. PARTIES (§ 19*)—NECESSARY PARTIES.**

Where a company with which a real estate broker was associated had no contract relations with defendant for whom the agent negotiated an exchange of certain property, the company was not a necessary party in an action by the agent for commissions, though, under the arrangement between the agent and the company, it had an interest in the commissions received by the agent.

[Ed. Note.—For other cases, see Parties, Cent. Dig. §§ 1589, 1598–1601; Dec. Dig. § 19.*]

Appeal from Bexar County Court; Geo. W. Huntress, Judge.

Action by J. T. Brown against Ed Inman and R. W. Hamilton, in which Hamilton filed a cross-action against Inman. From a judgment for plaintiff and for Hamilton on his cross-action, Inman appeals. Reversed and remanded.

T. F. Mangum and R. F. Townsend, both of San Antonio, for appellant. Leonard Brown, of San Antonio, for appellee.

JAMES, C. J. The action was brought by Brown against E. Inman and R. W. Hamilton for $250 for a commission alleged to have been due from Inman to Hamilton for procuring an exchange of land owned by Inman for a stock of hardware owned by the Cameron Hardware Company, which claim had been assigned and guaranteed by Hamilton to plaintiff Brown. The petition contained three counts, one on express contract, one on implied contract and quantum meruit, and the other on alleged custom. Hamilton set up practically the same matter, and prayed for judgment against Inman for whatever sum might be adjudged against him. Inman's answer consisted of general and special demurrers, denial, plea of limitations, fraudulent allegation of damages in excess of $200 in order to confer jurisdiction on the county court, that the custom alleged was unreasonable and void, and set up by way of a cross-action a claim for $110 against plaintiff. The court directed the jury to return a verdict for the plaintiff against defendants for the sum of $250, with interest from September 1, 1908, and in favor of Hamilton against his codefendant Inman for like sum, and to find in favor of plaintiff against Inman on the latter's cross-action. Inman has appealed.

His first assignment is that there was evidence upon which a verdict could have been rendered for appellant; hence the peremptory instruction was error. The testimony of both Inman and Hamilton shows clearly that there was no express contract. The liability of Inman to pay Hamilton commission rests upon an implied contract, if any.

Hamilton testified, among other things: That Inman phoned him, and asked if he had a hardware store to trade for land, and, on being told by witness that he had, he came to witness' office. They then went to the Bond-George Hardware Company, and witness introduced Inman to Mr. Bond and Mr. George, and submitted to him the Bond-George hardware stock, and Inman decided not to trade his land for the stock. They talked around a while, and finally there was put up another proposition, which was to trade a stock known as the Cameron hardware stock. Witness' recollection was that Mr. Bond was the first who submitted the Cameron hardware stock to Inman. This stock witness had not had for exchange, and he knew nothing about it until then. This was followed up and a deal consummated; the contract of exchange being made a month or two later after various negotiations. Hamilton testified: "It was after the contract was signed that I first demanded any commission * * * after Inman had gone ahead and made the deal with George * * * and the passing of the deed and contract was made before I demanded commission. * * * The deal dragged over two months as near as I can recollect. I don't know how long it was after Inman had been down to the Bond-George Hardware Company and Bond had put this other proposition up to him, and he thought about taking it, that I saw Inman, I don't know where. I told you I saw him in my office. He had not been down to see the land then with Brown and George. He had been up to look at the store first. I don't know whether he had been up to see the Cameron stock of goods or not the next time I saw him. I saw him a number of times after he had been up to Cameron to see that stock of goods, and I talked with him after that, and I remember the talk I had with him after he saw the Cameron stock of goods. I don't remember what the talk was or where it was. We talked it over and traded around a number of times, and finally I sent him to George. * * * We met quite a number of times. I don't know whether he came to my office, or whether I went to his, but I know I went down there to the office a number of times, and once or twice he rang me up and had me come down to the office in my buggy, and take him up there. I remember to have met him after that time—after he left town. I met him a number of times. I met him in my office and in his office. I don't know just how long it was after that meeting at Bond-George Hardware Company that I met

him in my office, but in the next few days. We just kept the proposition up to them. * * * Mr. Inman went to Cameron to take stock, and I understood there was some trouble about invoices or something, and he returned to San Antonio and declared the trade off. I went to see Mr. Inman and got the trade up again, and at last the contract was signed. I told Mr. Inman that he would owe me a commission of $250, and he said he would not pay me a commission."

Inman testified substantially as follows: "He came down there, and said he saw that I had been running, and that he had a hardware store that he wanted to trade, or had a stock of goods, and told me the party lived here in town, and he would take me over there to the parties who owned the stock, and we went. I went right on with him to the Bond-George Hardware Company, and, when I got there, they wanted to trade me an interest in the stock of goods over there that the Bond-George Hardware Company had here in San Antonio. I thought it was too big a thing for me, and, of course, when I found out what it was, why, it was all off with me right then. I quit. Well, Mr. Hamilton then he said he had other business to see to, and there he left us. I was looking at some wagons and buggies over there, and Mr. George told me about the Cameron stock of goods. That was the first I had ever heard of it. We talked it over, and I told him I would go over and look at the stock, and in a few days after that I did go over and looked at the stock. After that, the next time I saw Hamilton was down here on Joske's corner, I believe it was. He was coming down to my office to get me to go and take the men to see the land, and he said Mr. Brown was coming down. Mr. Brown was at Cameron. He was coming in on that train, and would leave here at 9 o'clock in the morning. It was near that time then, and he asked me if I could go. I told him I could, and I borrowed $3 of Mr. Hamilton. I don't know when was the first time Hamilton ever mentioned commission to me in anyway. It was along, I think, about the time the contract was being signed up, or something like that. I don't remember, but he came down to my office, and I was sitting in the door in a chair, and he said to me: 'Inman, I think you ought to pay me a little commission on your side of the deal.' I said, 'No; I don't think enough of this deal to pay you any commission. I wouldn't think about it if I had to pay you a commission.' * * * I have stated that Mr. Hamilton introduced me to Mr. George. I don't remember whether the contract for the trade was made or not when Mr. Hamilton came to me and demanded a commission. It was along about that time, somewhere. He spoke to me down there at the office, and said he thought I ought to pay it or ought to pay a commis-

sion. Yes; it is a fact that, after he told me in my office that he expected a commission, I went ahead and closed the deal. We traded. I refused to go through with the original deal when they couldn't bring up the invoice price—couldn't invoice the goods, because they didn't have an invoice. It is a fact, when I refused to go through with the deal, Hamilton came to see me once more, and took me down to Bond and George, and we entered into further negotiations and finally closed a deal. * * * I don't think I asked Mr. Hamilton to go down and show the land. When I met him over here at Joske's corner, he told me he didn't know anything about the land, and would rather that I go down and show it, and then I borrowed $3 from him and went down there and showed the land. * * * It is a fact that, after this first deal was declared off, Mr. Hamilton came to my office and got me and took me down to Bond-George Hardware Company, and then afterwards we consummated the deal. * * * When I refused to pay the commission, it was after this contract was entered into, the last time he was in my office." He further stated: "I saw Mr. Hamilton while the negotiations were going on. I saw him several times on the street * * * in my office two or three times. * * * I saw him a great many times. I saw him every few days on the street."

The witness Bond testified to the effect that, when Hamilton first came with Inman, he brought him to trade for the Cameron business, not for the Bond-Hardware stock; that they did not want to trade the latter stock. "As to whether Hamilton didn't know anything about the Cameron hardware business, and had never been there, I don't know that. I think he knew it before that time. As to whether I will swear that Hamilton knew anything about that Cameron business before George and I put it up to Inman there, I will say I think he did. I think we told him all about it."

It was shown by competent, and we think undisputed, testimony that, where a broker effects an exchange of property, the universal and notorious custom which prevailed was that each party would pay one-half of the commission, which would be 2½ per cent. of the value involved in the exchange. Inman testified that he was familiar with the prevailing customs among real estate agents at that time, and did not undertake to deny the above custom.

[1] The evidence, as we understand it, was sufficient to show that the exchange was effected through the efforts of Hamilton, and that he was resorted to and used by both parties. It was clearly shown by the testimony of both Hamilton and Inman that at one stage of the negotiations for the Cameron stock the deal came to an end by Inman declaring the trade off, and the trade was

resumed by the efforts of Hamilton. This would indicate clearly that he was the procuring cause of the exchange, and, if the testimony brings this exchange within the application of the said custom, Hamilton was entitled to 2½ per cent. commission from Inman.

[2] In order for such custom to have effect upon the matter of compensation, it was essential that the broker should have acted as a middleman in negotiating the exchange in the mutual interest of both parties, and without his being the particular agent of either. As stated in Walker's Law of Real Estate Agency, § 626: "An offer to prove a general custom among brokers for both parties to an exchange of lands to charge commissions to each held properly refused, for the reason that it appeared that the broker was the agent of one of the parties, and could not therefore legally demand compensation from the other"—citing Dartt v. Sonnesyn, 86 Minn. 55, 90 N. W. 115. The principle underlying this is that a custom will not be allowed to subvert a rule of law.

[3] Without discussing the testimony on the subject, we think it presented a question of fact whether or not, in view of the testimony, chiefly that of Bond, Hamilton was acting as the agent of the owners of the Cameron Hardware Company.

We think the court erred in giving the peremptory charge. This disposes practically of the seventh, ninth, eleventh, and twelfth assignments.

[4] The second assignment relates to the ruling of the court against the right of defendant Inman to plead the counterclaim set up by him. It appears that Hamilton assigned this claim for commission to plaintiff Brown and guaranteed it. Brown, it appears, was president of the Cameron Hardware Company, and Inman alleged in his cross-petition that Brown in person pointed out as belonging to the stock certain goods that went into the trade, which, in fact, belonged to one Vogel, who afterwards took them away from Inman, and asked for judgment against Brown for $110, the value of such goods. This counterclaim was an unliquidated demand, as was also plaintiff's demand, and in such a case one could be pleaded against the other. Taylor v. Bewley, 93 Tex. 524, 56 S. W. 746. There was testimony showing that Brown pointed out and represented said goods as belonging to the stock and guaranteed same. The bill of sale executed to Inman was as follows: "San Antonio, Texas, Sept. 1st, 1908. This is to certify that we have sold, assigned and transferred to Ed. Inman all stock of the Cameron Hardware Company, fully paid up and nonassessable, and guarantee that said stock is all of the issued or outstanding stock of said corporation, or for which it is liable. We further guarantee that said corporation owns, among other assets, a stock of hard-ware and furniture and fixtures, including four Deering sulky hay rakes and a four horse power International gasoline engine, all located in Cameron, Milam county, Texas, same including all property heretofore pointed out to said Inman as assets of said corporation. By the purchase of said stock, said Inman becomes the owner of all the assets of every description of said corporation, except notes and accounts due it, and we guarantee that the same is unincumbered and that said corporation owes no debts except a bill to James Meyer Buggy Company for four hundred forty-five dollars ($445.00) which the said Edward Inman assumes and agrees to pay, also Fall 5 wagons consigned & 2 Pat. churns consigned. [Signed] J. T. Brown, President. T. E. George. Leonard Brown."

[5] This bill of sale was not by the Cameron Hardware Company, but by the individuals who owned all of the stock of the corporation, and conveyed all the stock and guaranteed all property that had been pointed out to Inman. It bound plaintiff J. T. Brown according to its terms, although he signed "J. T. Brown, President," which was descriptio personæ. It was a joint and several obligation, and any one of the three could be held liable on it. The court erred in ignoring the plea and should have submitted the matter to the jury.

We need not pass on the third assignment in view of a reversal of the judgment.

We overrule the fourth assignment, and hold that the court did not err in its ruling on the statute of limitations.

We overrule the fifth and sixth assignments. It appears that Hamilton testified as follows: "In my association with A. A. Gray & Co. I got a certain per cent. of all the business that I closed up in the office, and they got a certain per cent. At the time of this transaction they were getting 75 per cent. and I was getting 25 per cent." Appellant contends that this shows that A. A. Gray & Co. were joint owners with Hamilton of this claim for commission, and were necessary parties to this suit. The above testimony merely shows that Hamilton had an arrangement to divide commissions on transactions he closed up in their office.

[6] This does not appear from the evidence to have been closed in that office, and, if it was, there were no contractual relations between Inman and A. A. Gray & Co., and their demand, if any, would be against Hamilton. Ross v. Carr, 15 N. M. 17, 103 Pac. 312.

[7] Hamilton had the right to assert and collect this claim, and the interest therein, if any, of A. A. Gray & Co., did not constitute them necessary parties, unless Inman had some defense applicable to them alone and desired to make them parties. Railway v. Gentry, 69 Tex. 631, 8 S. W. 98.

In this connection we overrule the tenth assignment.

It was for the jury to ascertain from the evidence whether or not the transaction was such as to make the custom applicable to it, and we think the testimony of Howard, complained of by the thirteenth assignment, went too far in stating what would not affect the legal liability of parties for commissions.

Reversed and remanded.